GRAHAM, administrator, &c. *vs.* DICKINSON and others.

Where a testator charged his personal estate with the payment of his debts, but it being insufficient for that purpose, his executors applied to the surrogate for, and obtained, an order for the sale of his real estate in the possession of his devisees, which was sold accordingly, and the proceeds applied to the payment of the debts of the testator; and subsequently the commissioners under the treaty with France awarded to the executors a sum of money, upon a claim which their testator had

Graham v. Dickinson.

against the French government at the time of his death : which fund they received for the benefit of the estate; *Held* that the sum of money thus received upon the French claim was in equity to be considered a substitute for the real estate sold for the payment of debts primarily chargeable upon the testator's personal property, and that it belonged to those who were the devisees, or the owners, of the land thus sold, at the time of the sale.

*Held also*, that such devisees, or owners, were exclusively entitled to the *spes recuperandi*, or the hope of obtaining satisfaction from the French government, for the claim against it, the moment their property was sold under the order of the surrogate. That they were entitled to the proceeds of that claim, not as real estate, but as a fund to which they had an equitable right to resort, to remunerate them for the loss of their lands.

Where the real estate of a married woman has been converted into personalty by operation of law, during her lifetime, it will be disposed of by the court, after her death, in the same manner as if she had herself converted it into personal property, previous to her death.

As between heirs and devisees, by the common law, lands undisposed of by the will are first to be applied to the payment of the debts of the testator; where the personal estate is not sufficient for that purpose.

The case of *Flanagan* v. *Flanagan*, (1 *Bro. C. C.* 500,) commented upon, and overruled.

THIS case came before the chancellor upon an appeal from a decree of the assistant vice chancellor of the first circuit, upon the following state of facts. Isaac Clason died in March 1815, seised of real estate in the county of Westchester and in the state of New Jersey, and of a large real estate in the city of New-York. By his will he gave to his daughter Eliza Cooper a demand which stood charged against her upon his books, and an annuity of $1000, charged upon his real estate so long as she was separated from her then husband; in full satisfaction of all further provision out of his estate. And he declared that neither she nor any of her children by her then husband should be considered as the legal representatives of any of his other children, or inherit any portion of his estate as their heirs. He then devised his real estate in Westchester to his three sons, with the right of survivorship between them if either should die without issue before the time appointed by him for the division of that property between them. His real estate in the city of New-York he devised to his three sons, William J., Isaac S. and Augustus W., and to his other four daughters, Catharine

Graham *v.* Dickinson.

Ann, Cornelia, Julia Ann, and Emily, in fee; but not to be divided until 1820, and the rents and profits in the meantime to be equally divided between them and the representatives of those who should die previous to 1820. The residue of his personal property he gave to his three sons, charged with the payment of legacies of $3570 to each of his four last mentioned daughters, upon their respective marriages. The real estate of the testator in the state of New Jersey was not disposed of by the will of the testator.

Catharine Ann Clason, one of the daughters of the testator, afterwards intermarried with John H. Graham, the complainant; but whether before or after the sale of a portion of the testator's real estate in the city of New-York, under the orders of the surrogate, as hereafter mentioned, did not appear by the pleadings or proofs in this cause. At the time of the death of the testator he had a claim against the French government, for vessels captured and condemned by the authority of that government; the payment of which claim, or a part thereof, was afterwards provided for by the treaty with France. But at the death of the testator this claim was considered of no value, and the executors being ignorant of its existence, it was not inventoried; nor was it taken into consideration by the surrogate in making the orders for the sale of real estate to pay the debts of the testator. The personal estate of the testator being insufficient to pay his debts, his executors applied for and obtained an order for the sale of the real estate in New Jersey; and the proceeds of that sale were applied to the payment of such debts. But that being insufficient, they applied to the surrogate of New-York, in February, 1816, and obtained an order for the sale of a part of the real estate of the testator in that city; and in Jan. 1817, they obtained a further order for the sale of other portions of the real estate in the city of New-York. Under the two last mentioned orders a large amount of the real estate was sold by the executors; and the proceeds of the sales, so far as was necessary, were applied to the payment of the debts. The residue was equally divided among the devisees of the lands sold; after deducting from the shares of the three sons of

the testator so much as the executors supposed they ought to contribute towards the payment of the debts, in reference to the value of the lands in Westchester county devised to the three sons exclusively.

Catharine Ann Clason, the wife of the complainant, died in May, 1831, without having had any issue; and her surviving husband afterwards took out letters of administration upon her estate. The commissioners under the French treaty subsequently awarded to the executors of Isaac Clason a large amount, for the claim which their testator had against the French government at the time of his death, and they received thereupon between sixteen and seventeen thousand dollars for the benefit of his estate. The complainant claimed one-seventh of the fund, recovered by the executors under the French treaty, as the personal representative of his wife, upon the ground that it was in equity a substitute for a part of the real estate, in the city of New-York, which had been sold for the payment of debts primarily chargeable upon the testator's personal estate. The executors resisted this claim, upon the ground that the fund was to be considered as real estate at the time of the death of the complainant's wife; and that it belonged to her heirs at law, and not to her personal representative.

The complainant thereupon filed his bill in this cause against the surviving executors of Isaac Clason, and against his devisees who still survived, and against the heirs and representatives of those who were dead, to recover his share of the fund in controversy. The assistant vice chancellor decided that the complainant was entitled to one-seventh of the net proceeds of the fund received by the executors under the French treaty. And he made a decree for an account; and for the payment of that share of the fund to him by the surviving executors, upon the coming in and confirmation of the master's report.

The following opinion was delivered by him.

M. Hoffman, A. V. C. In September, 1810, Isaac Clason made his last will and testament, giving one-seventh of his

real estate in the city of New-York to Catharine, the late wife of the complainant. In December, 1815, an application was made to the surrogate for an order for the sale of certain real estate of the testator, upon the alleged deficiency of the personalty. The order was granted, and real estate to the amount of over $60,000 was sold, and applied in payment of debts. On the 24th of May, 1831, the wife of the complainant, one of the children and devisees of Isaac Clason, died without leaving issue. On the 4th of July, 1831, the French treaty was made, and under it the defendants, the executors of Clason, have received at different times about $16,000. The question is between the complainant, as administrator of his wife, a daughter and devisee of Isaac Clason, and the heirs at law of such daughter, as to the right to this sum, or part of it. As favorable a light for the heirs at law as any in which the case can be presented is this, that the real estate had been to a great extent unnecessarily sold under a judicial sentence, and that there was a surplus. Or to put the case closer to the actual facts, suppose after the sale, and deeds delivered, but before distribution among the creditors, assets had unexpectedly come in from personal property, and to the amount in question. The creditors then would be paid out of personal estate. What becomes of the surplus proceeds? No doubt the devisee of the real estate, the wife of the complainant, would take. It is in effect a charge by the law upon real estate; precisely as a charge by the will of a testator, for payment of debts, with directions to sell. In such a case, undeniably, the surplus would go to the heir as against a mere general residuary legatee. (*Robinson* v. *Taylor*, 2 *Bro. C. C.* 589. *Halliday* v. *Hudson*, 3 *Ves.* 310.) So when a mortgage deed contains a power of sale, the surplus money to be paid to the mortgagor, his executors and administrators, if the sale takes place in the lifetime of the mortgagor, the surplus is personal estate; but if after his death, the equity of redemption descending to the heir, he takes the surplus. (*Wright* v. *Rose*, 2 *Sim. & Stu.* 323. *Moses* v. *Murgatroyd*, 1 *John. Ch. Rep.* 130.) The wife of the complainant plainly, therefore, in the case supposed would have taken the surplus

Graham *v.* Dickinson.

proceeds of the real estate in her capacity of devisee. But she would have taken such surplus as money, not as land. And the devolution from her would be altered accordingly. (*Dixon* v. *Dawson,* 2 *Sim. & Stu.* 327. *Smith* v. *Claxton,* 4 *Mad. Rep.* 484.) "I adhere," says Sir John Leach, "to the principle which I stated in the case of *Smith* v. *Claxton,* that where the land is properly sold by trustees, and there is only a partial distribution of the produce of sale, there the surplus belongs to the heir as *money, not as land.*" The testator devised real estate in trust to sell, and out of the proceeds to pay various charges and legacies. The sale was made in the lifetime of her heir at law, and there was a surplus. He was held entitled, as against a residuary legatee. But he died before the trusts of the will were completed. And the surplus was held to have vested in him as money, and to belong to his personal representative. The case of *Flanagan* v. *Flanagan,* before Lord Camden, (*Leigh & Dalzell,* 164, 1 *Bro. C. Rep.* 500,) goes upon a similar principle. The surplus proceeds were decreed to go, and of course must have gone, to the devisees of the real estate. But although they would have the character of realty, so as to let in all his real charges, such as judgments, yet it so vested in him as upon his death to go to his personal representatives. And this distinction meets and reconciles the case of *Banks* v. *Scott,* (5 *Mad. Rep.* 493,) so much relied upon. The avails of the estates sold after the bankrupt's death, went to his heir at law, being unnecessarily sold, as it turned out. The decision was placed upon the ground that the property descended, subject to the charge of the bankrupt laws. The heir was living. The question would have been very different if that heir had been dead, and the contest had arisen between his heirs and personal representatives. Then the cases I have referred to would have applied. The complainant is entitled to his share of the fund.

*John Anthon,* for the appellants. In all cases the intention of the testator must be respected, and technical rules of the court of equity cannot be allowed to control it. It was clearly

the intention of the testator, in this case, that his real estate should remain in his own family, and descend, according to law, in his own line; in the event of intestacy in any of his children to whom he devised it. The wife of the complainant having died intestate, and there being no issue of the marriage, her portion of the real estate descended to her heirs at law, free from all claim on the part of the complainant, and such was the intention of the testator. The personal estate was charged with the payment of the testator's debts, and was sufficient for that purpose. The lands were only temporarily resorted to until the proper fund was realized. The proper fund for payment of debts, under the will, having now come into the hands of the executors, it must be treated in equity as having always been in their hands; and thus the intentions of the testator in his will can be carried out. The real estate having been unnecessarily converted into personalty, or temporarily only, when the necessity ceased and the proper fund came into the hands of the executors, they held that fund as real estate, in trust for the devisee and her heirs.

If the fund in question is to be deemed from the time of the sale, part of the personal estate of the testator, then it goes, under the will, to the residuary legatee. The conversion here, was the result of a mistake in fact; and this cannot, on any principle of equity, be allowed to change the rights of the heir. And in this particular the case under consideration differs from all the cases cited; in which the conversion was the result of hostile decrees, or judgments, unimpeached. Under all these circumstances, this fund represents real estate under the will, and is real estate in equity; and must descend to the heirs at law of the devisee. To allow the husband of the devisee to take it, in preference to her heirs, would be a clear and palpable violation of the testator's intention, and of the plain rights of the heirs at law. If this sum is not the entire sum for which the real estate of Mrs. Graham was sold, but a surplus after payment of the debts, it stands upon grounds equally conclusive. The purposes of the conversion being answered, the surplus is real estate, and goes to the heir. Such would have

Graham v. Dickinson.

been the rule of equity, had the testator directed the sale; *a fortiori* it must be so when the occurrence of unforeseen circumstances has so far affected the will of the testator. On every ground therefore the fund in question belongs to the heirs.

*H. P. Edwards & Geo. Wood*, for the respondent. The real estate in the city of New-York, though liable to the payment of the testator's debts, under the will, was not made the primary fund for that purpose. The real estate having been taken and applied to the payment of such debts, the devisees thereof are entitled to claim the personal estate since recovered, and a portion of which is claimed in this suit, in exoneration of the real estate thus disposed of, and applied to the payment of the said debts. In this construction of the law as applicable to this branch of the case, all parties agree ; and, in pursuance of this construction, the executors have distributed the money received by them under the French treaty amongst the devisees, with two exceptions. That the devisees of the real estate sold to pay debts, are entitled to the money, is not disputed ; and the only question is, whether on the death of Catharine Ann Graham, one of the devisees, before the distribution of the money by the executors, the same goes to her heirs at law, or to her personal representatives. The property claimed in this suit being *personal estate*, and claimed as such in equity, the complainant, on the death of his wife, is entitled to it as her administrator. If this personal estate were even to be considered in the light of the proceeds of the real estate, sold under the order of the court for the payment of debts, the conversion into personalty being made by the court, in a course of law, without fraud, the proceeds would be considered as personal estate, and as such pass to the personal representative. The rule is universal, that when real estate has been converted into money, either in pursuance of a power contained in the will of the testator, or under the order of a court having authority to make such order, and where there is no fraud, such proceeds of real estate are considered in equity as personal estate, and follow the order of distribution of personal estate. This is

Graham v. Dickinson.

abundantly sustained by authority. In *Smith* v. *Claxton*, (4 *Mad. Ch. Rep.* 484,) the principle is laid down as applicable to wills; and in that case it was decided that where real estate is directed to be sold, and the proceeds divided between A. & B., and A. dies in the lifetime of the devisor, the heir is substituted in his place, and takes the share of A. But he takes it as money, and not as land. In *Dixon* v. *Dawson*, (2 *Sim. & Stew.* 327, 339,) the same principle is established; and it was decided that the freehold estate having been properly sold under the directions of the will, in the heir's lifetime, the heir at law was entitled to the surplus; but that such surplus, being money, it was part of his personal estate, and the heir being dead it belonged to his personal representatives. *Banks et al.* v. *Scott*, (5 *Mad.* 500,) was a case of the sale of real estate under proceedings against a bankrupt. There was a surplus of the proceeds of the real estate of the bankrupt, after the payment of all his debts. It was decided that the surplus of the proceeds of the real estate sold, or contracted to be sold, in the lifetime of the bankrupt, must, at his death, be considered as converted into personalty, and would go to his personal representatives. But that proceeds of real estate sold after his death would go to his heir at law. And that it made no difference, in principle, whether such conversion of the real estate was made in pursuance of the provisions of the law, or the provisions of the party. This case was relied upon by the defendants' counsel, in the argument before the vice chancellor, to show that the money, received by the executors of Isaac Clason, should go to the heirs at law of Catharine Ann Graham. Instead of sustaining the position taken by the defendants' counsel, it proves directly the reverse; for it establishes the general proposition that when real estate has been converted into *money*, in due course of law, such money is not considered as real estate but personal estate; and upon this principle that portion of the bankrupt's real estate which was sold in his lifetime, went to his next of kin. For as to the part which was sold after the bankrupt's death, although the surplus went to his heir at law, still it went to him as money; and if the heir at law had died before it came into

his possession, it would have gone to his next of kin, and not to his heir at law ; which is the very principle we contend for in this case. (*See Dixon* v. *Dawson,* 2 *Sim. & Slu.* 339.)

But the case of *Flanagan* v. *Flanagan,* cited in *Leigh & Dalzel on Equitable Conversion,* 164, 5, (5 *Law Lib.* 82, 83,) is a case precisely analogous to the present, and sustains every principle for which we contend. In that case, a decree was made for the sale of the real estate, to supply the deficiency of the personal estate for the payment of debts. A sale was made in pursuance of such decree, and although there was a surplus, the court decided that the sale could not be considered as improperly made, there being no fraud, and that such surplus was money, and as such should go to the personal representative of the devisee of the real estate thus sold ; such devisee having died after the sale of the real estate ; and that the heir at law of such devisee had no right to receive any portion of such surplus. The personal estate in question is claimed by the owners of the proceeds of the real estate, sold and converted as aforesaid, on the ground that it ought to be substituted in the place of such proceeds. And as appears from the cases cited, the proceeds are in equity deemed, as they are in fact, personal estate. But the defendant's counsel says, in his argument, that " this case differs from all the cases cited, and that in those cases the conversion was the result of hostile decrees, or judgments, unimpeached." That is a mistake ; for the conversion in this case was made in pursuance of a decree of the surrogate of the county of New-York, which has been acquiesced in by all parties; and, as an evidence of such acquiesence, the executors of Isaac Clason have paid over the moneys received by them from the French government to five of the devisees of the real estate sold as aforesaid, amongst which said devisees was the wife of one of the defendants, John F. Delaplaine. The defendants' counsel says that to allow the complainant in this suit to receive the share of Catharine Ann Graham in preference to her heirs, would be a clear and palpable violation of the testator's intention, and of the plain rights of the heirs at law. The cases above cited show that it would not be a violation of the

Graham *v.* Dickinson.

rights of the heirs at law. It would not be in violation of the intention of the testator; for the devise of the real estate is absolute, and without any condition or limitation. Of course, then, it was the intention of the testator that in case one of the devisees should die, the share of such devisee should go to the person whom the law pointed out as his or her legal representative; which in this case is the administrator of the deceased devisee. If the testator had any such intention as the counsel assumes that he had, it is not declared in his will. There is a provision in the will of Isaac Clason that no division shall be made of the real estate until 1820, "and if any of my children shall die before such division of my said real estate shall be made, the legal representatives of those who shall die, shall be entitled to such portion," &c. The only intention, then, which the testator has expressed in his will applies to the decease of one of the devisees before 1820. He expresses no intention in case of the decease of any of the devisees after 1820. And, even in case of the death of one of the devisees before 1820, the only expression of the testator's intention is, that the share of such devisee shall go to his legal representatives; which is all we contend for in this case.

*J. Anthon,* in reply. So far as authority is concerned, there is no case in point against us. The cases cited by the counsel for the respondents travel around the question. But no chancellor has yet undertaken to meet this precise case in the teeth, and to declare, that an accidental occurrence, like the one in this case, shall in effect, by the application of arbitrary general rules, make a will for a testator obviously different from his expressed intentions. The case of *Flanagan* v. *Flanagan* is the only one in the books which really approaches this case; and that wants the peculiar feature which distinguishes the present from all the reported cases. Its effect was not to take the real estate of the wife out of the course of its strict legal descent and give it to the husband, out of the testator's line and against the manifest intention expressed in his will. All the other cases cited are more or less applications of the rule of conversion,

Graham *v.* Dickinson.

consistently, according to legal inference, with the testator's intention, but certainly never against it. *Flanagan* v. *Flanagan* is then, in truth, the only case on which the respondent can hang his hopes; and this, as I have already observed, is by no means parallel. It is a case also of questionable authority, even so far as it goes. It is nowhere reported at length. The counsel for the respondent appear to have the insuperable difficulty cast in their way, by the testator's intention declared in his will, in direct opposition to the rule he seeks to establish; and hence, after referring to insufficient cases, they look to the will and endeavor to show that it is not inconsistent with the testator's views that the property in question should go to alien families. Now on this head the court will perceive that the will is a very severe one, dealing out a modicum to one of his own blood, Mrs. Cooper, who had offended him by her marriage, and in effect disinheriting her issue, and then parceling out to each of his children with great strictness his or her particular share. There is no overflowing of affection for the human race, and no intention that his labors shall go to enrich persons of whose very existence he was ignorant. The counsel for the respondent, on this branch of the case, rely on a particular section of the will as manifesting either an indifference on this point, on the part of the testator, or a willingness and intention that the property devised should pass to legal representatives in a different sense from heirs. In both, I think they are quite unfortunate. In the clause thus referred to there is a marked distinction in the language, strongly evidencing the testator's intention to keep the lands devised in his own line: thus, "All my real estate in the city and county of New-York, I give and devise to my daughter Cornelia, &c. and to their heirs and assigns forever, to be equally divided, &c. but no division shall be made &c. until 1820." Until such division, the will provides "that the rents and profits shall be equally divided;" and then follows the clause on which the respondent relies; "and if any of my said children shall die before such division is made, the legal representatives of those who shall die, shall be entitled, (not to the share of the dece-

Graham *v.* Dickinson.

dent in the lands, but) to such portion of the said rents, issues and profits as the person they shall represent would have been entitled to if living." If this clause announces any thing in relation to the testator's intention, it clearly announces this: that he intended that the lands should always descend to the heirs at law of the devisees, but that the rents and profits might, in the event of the death of the devisee, go to the executor of such devisee, while the lands descended to the heirs. I think the force of this position, drawn from the will, was before the mind of my learned opponent, while framing this part of his argument. I cannot otherwise account for his careful omission of the words *rents, issues and profits,* after the word *portion ;* words which so decidedly limit its meaning. In conclusion, all that the appellants insist upon in this case, is that the will of the testator be observed, and that such will be not defeated by any perverted application of arbitrary rules, adopted by the court of chancery for a very different purpose, viz. to reach the intent and not to defeat it.

THE CHANCELLOR. There can be no doubt that the fund in controversy, in equity, must be considered as a substitute for the land in the city of New-York; and that it belongs to those to whom the land was devised, or to those who now represent their rights, exclusively. It is suggested in some of the answers that the real estate in New-Jersey, which was not disposed of by the will of the testator, was also sold for the payment of the debts; that such land descended to all the children of the decedent, and that by the laws of New-Jersey which were then in force, the sons took by descent, from their father, shares which were twice as large as those of the daughters; and that they, or their representatives, are entitled to a part of the fund in controversy, on account of the sale of those lands. The answer to that claim is that the value of the lands which were sold in New-York, far exceeded the amount recovered under the French treaty; and that, by the common law, as between heirs and devisees, the land which is undisposed of by the will of the testator is primarily liable for the payment of the debts of the de

cedent, and must first be resorted to for that purpose. Here, the whole personal estate of the testator, including the amount subsequently recovered under the French treaty, and the proceeds of the whole real estate undisposed of by the will, were insufficient to pay the debts of the testator. The devisees of the real estate, in the city of New-York, which was sold to pay debts, exclusively were entitled to the *spes recuperandi*, or hope of obtaining satisfaction from the French government, for the testator's vessels which had been illegally captured and condemned. For if this fund had been received and applied to the payment of the debts, immediately after the death of the testator, the real estate in New Jersey, not disposed of by the will, must still have been sold for the same purpose. Not so, however, as to a portion of the real estate in the city of New-York, which was devised to seven of the testator's children in equal proportions. For if the part of the personal estate which then consisted in the mere hope of obtaining an indemnity from the French government, could have been realized at that time, a part of the real estate in the city of New-York, which was subsequently sold under the surrogate's order, would have been saved to the devisees. This brings me to the main question in controversy in this cause. Was the hope or chance of obtaining remuneration from the French government, to which the devisees of the city property were equitably entitled the moment their property was sold under the surrogate's order, real or personal estate, before the money was actually received by the executors, under the treaty?

If either of the devisees had died before the actual sale of the property under the surrogate's order, even after the order for sale had been made, that land would have descended to the heirs at law of the decedent. And upon a sale of such land they would have been subrogated to the rights of the creditors, as to this French claim, which was a part of the personal estate of Isaac Clason. For in that case the real estate of the heirs of the original devisee, and not the real estate of such devisee, would have been sold for the payment of the debt which was chargeable primarily upon the personal estate of the devisor;

Graham *v.* Dickinson.

and the heirs of the devisee would of course be subrogated to the rights of the creditors as to the personal estate, which was primarily liable. So, if a judgment debtor should die leaving personal property sufficient to pay his debts, and the sheriff, having advertised the real estate of the decedent for sale previous to his death, should afterwards proceed and sell the same, after it had become the real estate of the heirs at law, the heirs would be entitled to be subrogated to the rights of the judgment creditor, as against the personal estate which was primarily liable for the payment of such judgment. This being so, the decision of Lord Camden, in *Flanagan* v. *Flanagan*, referred to by the counsel of the appellants and by the assistant vice chancellor, was clearly wrong; if the facts of that case are correctly stated by Sir Thomas Sewell in *Fletcher* v. *Ashburner*, (1 *Bro. C. C.* 500.) For, from that statement it appears that the land which was sold under the decree by mistake, was not sold until after the legal title had been cast upon the grandson, as heir; the grandfather, to whom that half of the estate belonged, having died subsequent to the decree, but before the sale. It was the property of the grandson, therefore, which was erroneously sold in that case. Consequently he was not only equitably but legally entitled to the proceeds of the erroneous sale. (*Smith* v. *Kearney,* 2 *Barb. Ch. Rep.* 551.) And the same should not have been decreed to the personal representatives of the grandfather, as they properly would have been had the land been actually converted into personal estate by a sale previous to his death.

In the case under consideration, the real estate had actually been converted into personalty, by the sale, fourteen years before the death of Mrs. Graham; although the substituted fund was not really received by the executors until some time after her death. The moment the land was sold, the devisees became entitled to the proceeds of the French claim; not as real estate, but as a personal fund to which they had an equitable right to resort to remunerate them for the loss of the land. The right of Mrs. Graham to one-seventh of the French claim was an interest in personal estate which she had at the time of

her death. And her real and her personal representatives being equally volunteers, there is nothing to take this case out of the general rule that they must take their estate of the intestate as they find it.

It is true, if the real estate of the devisee had not been sold under the order of the surrogate, and she had continued to own it until the time of her death, it would have descended to her heirs at law, and her husband would have been excluded. But there is no legal presumption that a feme covert who is the owner of real estate will not join with her husband in selling it, for the purpose of converting it into personalty. And the real estate in this case having been converted into personalty, by operation of law, during her lifetime, it must now be disposed of in the same manner as if she had herself converted it into personal property.

The cases referred to in the opinion of the assistant vice chancellor fully sustain his decision in this case; and I do not see how he could have come to a different conclusion without disturbing principles which have been long settled. The decree appealed from must therefore be affirmed, with costs.